1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

9
10
11

MARY C. E.,

Case No. ED CV 25-1269-E

12

Plaintiff,

13

v.

14

FRANK BISIGNANO,
Commissioner of Social Security,

**MEMORANDUM OPINION**

15

**AND ORDER OF REMAND**

16

Defendant.

17
18
19

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY

20

ORDERED that this matter is remanded for further administrative action consistent

21

with this Opinion.

22
23

**PROCEEDINGS**

24
25

Plaintiff filed a complaint on May 23, 2025, seeking review of the

26

Commissioner's denial of disability benefits.  The parties consented to proceed

27

before a United States Magistrate Judge on June 6, 2025.  Plaintiff filed "Plaintiff's

28

Brief" on August 28, 2025.  Defendant filed "Defendant's Brief" on September 29,

1    2025.  Plaintiff filed "Plaintiff's Reply Brief" on October 15, 2025.

2

3    **BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

4

5         On March 9, 2022, Plaintiff filed an application for supplemental security

6    income, alleging disability since August 4, 2019, based on impairments including

7    Type 1 diabetes, hypertension, diabetic neuropathy, chronic low sodium, and colitis

8    (Administrative Record ("A.R.") 219-24, 242).  At the administrative hearing in

9    March of 2024, Plaintiff testified to subjective symptoms of allegedly disabling

10   severity (e.g., she testified she could sit for only 40 minutes at a time, stand for only

11   five minutes at a time, walk for only a few minutes without resting, lift and carry

12   only eight pounds, and she also testified she has numbness and diminished strength

13   in her right hand as a result of neuropathy) (A.R. 77-78).

14

15        In a May 9, 2024 decision, an Administrative Law Judge ("ALJ") found that

16   Plaintiff had the following severe impairments: diabetes mellitus I, polyneuropathy,

17   chronic kidney disease stage 2, hypertension, colitis, and obesity (A.R. 41-54).

18   However, the ALJ also found that Plaintiff retains a residual functional capacity

19   ("RFC") to perform a range of light work with:  (1) standing and/or walking for a

20   total of no more than four hours in an eight-hour workday; (2) no crawling and no

21   climbing ladders, ropes, or scaffolds; (3) no more than occasional climbing of

22   ramps or stairs, and occasional balancing, stooping, kneeling, and crouching; (4) no

23   concentrated exposure to extreme cold or industrial vibration, and no exposure to

24   workplace hazards such as unprotected heights and operational control of heavy

25   machinery.  See A.R. 48-53 (finding mostly persuasive the internal medicine

26   consultative examiner's opinion (at A.R. 834) that Plaintiff could perform some

27   light work).  The ALJ discounted Plaintiff's testimony suggesting greater

28   limitations (A.R. 49-52).  The ALJ found that Plaintiff could perform her past work

as a personnel clerk or administrative clerk as those jobs were generally performed. <u>See</u> A.R. 54 (adopting vocational expert testimony at A.R. 78-82).[1] The ALJ concluded that Plaintiff had not been disabled since the March 9, 2022 application date. On April 9, 2025, the Appeals Council denied review (A.R. 1-3).

## STANDARD OF REVIEW

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. <u>See</u> <u>Carmickle v. Comm'r</u>, 533 F.3d 1155, 1159 (9th Cir. 2008); <u>Hoopai v. Astrue</u>, 499 F.3d 1071, 1074 (9th Cir. 2007); <u>see also</u> <u>Brewes v. Comm'r</u>, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citation and quotations omitted); <u>see also</u> <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1066 (9th Cir. 2006).

---

[1] The vocational expert testified that, if Plaintiff were also limited to occasional manipulative activities (as the consultative examiner had found), Plaintiff could not perform her past work (A.R. 80). If Plaintiff (a) could not perform her past work and (b) were limited to sedentary or light work, she may be deemed disabled under the Medical-Vocational Guidelines, Part 404 Subpart P Appendix 2 (commonly known as the "Grids"), given her advanced age (A.R. 93), high school education (or more) (A.R. 243), and previous work experience performing semi-skilled work with no transferrable skills (A.R. 80-81). <u>See</u> Grid Rules 201.06 and 202.06 (directing a finding of disability where a claimant's education does not provide for direct entry into skilled work; <u>compare</u> Grid Rules 201.05, 201.08, 202.5, and 202.08 (directing a finding of not disabled where a claimant's education provides for direct entry into skilled work, irrespective of whether the claimant has past relevant work)). The vocational expert testified that Plaintiff's case would be a "grid case" if she could not perform any past relevant work (A.R. 80-81). The record does not indicate whether Plaintiff's college education would provide for direct entry into skilled work.

1

2

**DISCUSSION**

3         Plaintiff contends that:  (1) the ALJ failed to provide legally sufficient

4    reasons for discounting Plaintiff's testimony and statements suggesting greater

5    limitations than the ALJ found to exist; and (2) in light of new regulations reducing

6    the lookback period from 15 to 5 years for past relevant work, substantial evidence

7    no longer supports the ALJ's finding that Plaintiff has past relevant work she could

8    perform.  As discussed below, the Court finds that the ALJ did not provide legally

9    sufficient reasons for discounting Plaintiff's testimony and statements.  On remand,

10   the Administration should also expand the record and reconsider whether Plaintiff

11   has past relevant work within the meaning of the new regulations.

12

13   **I.**    **The ALJ Failed to Provide Legally Sufficient Reasons for Discounting**

14          **Plaintiff's Testimony and Statements Suggesting Greater Limitations**

15          **than the ALJ Found to Exist.**

16

17        Plaintiff contends that the ALJ's stated reasoning for discounting Plaintiff's

18   testimony and statements was legally insufficient.  As discussed below, the Court

19   agrees.

20

21        **A.**    **Summary of Plaintiff's Testimony and Statements**

22

23        Plaintiff last worked in early August, 2019 (A.R. 242).  She testified that she

24   then was terminated from her job at a design store because the new owner did not

25   need her (A.R. 72-73).  Even if Plaintiff had not been terminated, however, she did

26   not think she could have continued working (A.R. 73).  She had been having

27   "gastrointestinal episodes" and high blood pressure problems, which led to her

28   being hospitalized and missing work in the first few months that she worked for the

4

design store (A.R. 73).  Not long after she was terminated, Plaintiff had a septic shock emergency and became very sick (A.R. 73).  She was in the ICU for over a month, and she has not been the same since (A.R. 73, 76).

Plaintiff said she is a "brittle diabetic" with insulin-dependent Type 1 diabetes, meaning that her blood sugars are difficult to control (A.R. 75).  She reportedly feels terrible when her sugars are too low or too high (id.).  She has right hand neuropathy due to diabetes, with cramping, numbness and diminished strength (A.R. 76).  She has colitis and could have gastroparesis (where her stomach does not empty properly) which causes her to have urgent bowl movements and she sometimes does not make it to the bathroom (A.R. 76-77).  She also has high blood pressure, depression, anxiety, chronic low sodium (which makes her feel weak and fatigued), migraines (which occur several times a month and last one to two days), and sleep apnea - all of which worsened after her septic shock (A.R. 75-77).  Plaintiff estimated that she could sit for only 30 to 40 minutes, stand for only five minutes, walk for only a few minutes without resting, and lift only eight pounds (A.R. 77-78).

In an April, 2022 Function Report form, Plaintiff reported that, in the past several years, she had to leave or had been let go from work due to health reasons (A.R. 271-79).  She had many sick days and hospital visits (A.R. 271).  She spent her days checking her blood sugar 6-8 times a day, checking her blood pressure, taking medications and eating breakfast, taking care of her mother, who had Alzheimer's disease and her father, who had heart disease, resting, cooking on some days, and watching television, with a note that some days are worse for her when she has very high blood pressure (A.R. 271-72).  She said her care for her parents was "very limited/more companionship" (A.R. 272).  She also took care of several cats (A.R. 272).  She could do personal care, but it took a lot of energy for

her to do so, and she could not even stand in the shower (A.R. 272). She could occasionally do some household chores with help, but could not do all because of weakness, fatigue, and fluctuating high blood pressure and blood sugars (A.R. 273). She could drive and shop in stores for basic necessities (A.R. 274). She explained that it took her days to complete the form, her focus is difficult, and her conditions had compounded and gotten progressively worse over the past three years, making it impossible for her to be employed (A.R. 277). Plaintiff's brother reported limitations consistent with what Plaintiff had reported, and he explained that Plaintiff engaged in very limited activity, spent most of the day in bed, and did not care for anyone other than occasionally preparing meals for her parents (A.R. 280-87).

Plaintiff sent a letter to the Administration in October of 2022, enclosing records from a hospital stay for colitis from August 31 to September 6, 2022 (A.R. 718-25). Plaintiff reported that she also had a hospital stay for colitis in mid-May that year (A.R. 718). She said her episodes of colitis are unpredictable, out of her control, and render her unable to walk much or exert herself (A.R. 718). She said her colitis had gotten much worse and had made her weak and depressed (A.R. 718).

### B.     Summary of the Relevant Medical Record

The medical record is missing some treatment notes which might have given more context to Plaintiff's testimony and statements. A treatment note indicates that Plaintiff reported she had septic shock and her kidneys shut down in January of 2020 (A.R. 564). There is a record of Plaintiff being transported by ambulance to a hospital for nausea and vomiting with low blood sugar in January of 2020, but there are no related treatment records from the hospital (A.R. 1316-43). In March of

2020, Plaintiff was transported by ambulance to the hospital for syncope/near syncope, which had caused her to fall, orthostatic blood pressure, and vomiting (A.R. 1306-15). However, there also are no treatment records from the March, 2020 hospital visit.

Consistent with Plaintiff's testimony, the available treatment notes suggest that Plaintiff's diabetes and hypertension were difficult to control, she sometimes had low blood sodium which made her weak, and she had colitis which sometimes required hospitalization to treat. The first available regular treatment note is from March of 2021, a year before Plaintiff filed her application for benefits. Plaintiff presented to her primary care doctor for medication for chronic headaches and for a new medication (Trazodone) for sleep which she had used during her last hospitalization (A.R. 513-18). She reportedly had been seeing a nephrologist (A.R. 513). Her physical examination reported no abnormalities, but there were no vitals reported for this visit to record her blood pressure and no glucose testing (A.R. 517-18; see A.R. 497-98 (vitals history)).

In May of 2021, Plaintiff went to the emergency room for weakness beginning a few months earlier that assertedly had worsened in the previous 10 days, with extreme fatigue, shortness of breath, dizziness with minimal exertion,  and right flank pain with nausea (A.R. 408-24). She complained she was "unable to function," and she thought her sodium was low and her blood pressure was "not right" (A.R. 408). Testing showed that she had chronic hyponatremia (low blood sodium), and her nephrologist recommended that she take salt tablets (A.R. 414).

In June of 2021, Plaintiff returned to the emergency room for elevated blood pressure, mild constant diffuse headaches, mild nausea, and urinary frequency (A.R. 396-408). She improved with IV fluids and bedrest (A.R. 401). Plaintiff followed

up with her nephrologist in June, who noted Plaintiff had been admitted several times to the hospital for difficult to control diabetes and hypertension (her glucose had been elevated over 300, and her systolic blood pressure had been over 200), hyponatremia, and nausea, vomiting, and headaches (A.R. 356-67). The nephrologist ordered testing, modified Plaintiff's medications and referred Plaintiff to an endocrinologist (A.R. 361). In July, Plaintiff followed up for hypertension and renal insufficiency (A.R. 350-56). Her nephrologist noted that Plaintiff's hyponatremia had improved, her mild chronic kidney disease had improved with increased fluid intake, her orthostatic hypotension had resolved, and her hypertension was "not at goal" (A.R. 350, 356). Plaintiff was not taking salt tablets at that time and had not yet seen an endocrinologist for her diabetes (A.R. 350-51). Her blood pressure was still elevated, which was causing her fatigue, and her diabetes was "a bit labile" (A.R. 351). She had headaches when her blood sugar was high, and she had adjusted her blood sugar medication to avoid hypoglycemia (A.R. 351). She was having neuropathy and joint pains, which had improved (A.R. 351). Her nephrologist again ordered testing and modified Plaintiff's medications (A.R. 354).

In September of 2021, Plaintiff was transported by ambulance to the emergency room after she reported weakness/anxiety with low blood sugar (A.R. 1266-75). At the emergency room, she complained of worsening headache, poor blood pressure management, intermittent mild chest pain with headaches over the past week, and she said she had come in because her blood pressure was high and her symptoms had worsened (A.R. 375-96). She was observed for "diagnostic uncertainty," and was assessed with a nonintractable headache, hyperglycemia, and anxiety, which improved with treatment (A.R. 381-82). She followed up with her primary care doctor later that month, requesting medication refills and authorization for a glucose sensor (A.R. 535-41). She reported she had not worked in two years

and was having lots of stress and long-term effects of sepsis and COVID, including fatigue and shortness of breath (A.R. 535).  There were no abnormalities reported on examination (A.R. 539; see also A.R. 542-54 (visits for other conditions in November and December of 2021, also reporting no abnormalities on examination)).  Her doctor ordered testing and refilled Plaintiff's medications (A.R. 540-41).

In February of 2022, Plaintiff presented to a physician assistant for a blood pressure evaluation (A.R. 556).  Plaintiff asked for:  a referral to an endocrinologist for Type 1 diabetes management because her former endocrinologist had retired; an appointment with her primary doctor who had been prescribing hypertension medications; and a sleep study, because she was experiencing extreme fatigue which made her unable to function during the day (A.R. 556-58).  She was given the referrals (A.R. 558).

Plaintiff returned in March of 2022 to review test results, asking for a different endocrinologist referral, and noting that her blood sugar had been high and low, although she was using insulin with meals every morning and every night (A.R. 564).  Testing showed mild renal insufficiency and pyelonephritis (A.R. 566).  Plaintiff was given a new endocrinologist referral (A.R. 566).

Later in March of 2022, Plaintiff went to the emergency room for diarrhea and dizziness, which had caused her to pass out and fall, and she was diagnosed with orthostatic hypotension (A.R. 1160-77).  When Plaintiff followed up with her primary care provider in April of 2022, she complained of mild headaches and fatigue and elevated blood pressure for the previous month (A.R. 691-700).  Examinations were normal (A.R. 696, 698-99).  Her medications were adjusted, and she was instructed to monitor her blood pressure twice daily (A.R. 696, 699-700).  ///

From May 16 to 20, 2022, Plaintiff was hospitalized for colitis with generalized weakness, acute hyponatremia, hyperglycemia, and moderate dehydration (A.R. 1077-1159).  At discharge, she was diagnosed with poorly controlled diabetes, poorly controlled hypertension, chronic kidney disease stage 2, pulmonary hypertension, and normocytic anemia (A.R. 1099).  Plaintiff saw her nephrologist later in May, who noted Plaintiff recently had been hospitalized for colitis, had low blood sodium on admission (see A.R. 1085-86), elevated blood pressure throughout her stay (see A.R. 1080, 1089), and required an iron transfusion for anemia (A.R. 577-83; see also 1100 (note regarding consultation with Plaintiff's nephrologist, who confirmed she has difficult-to-control hypertension)).  Plaintiff reported that she was fatigued and had not been able to exercise (A.R. 578).  Plaintiff's doctor indicated that Plaintiff's renal function, anxiety, depression, neuropathy, and headaches were stable (A.R. 577-78).  Her hyponatremia, anemia, and arthralgias were improving (A.R. 577-78).  Her hypertension was still "not at goal" (A.R. 577).  Her blood glucose was "still labile" (A.R. 578).  She was awaiting a consultation with a new endocrinologist (A.R. 578).  She reportedly "[did] not appear ill," and had no abnormalities reported on examination, apart from high blood pressure (A.R. 579).  The plan was to maintain good glycemic control, increase Plaintiff's blood pressure medication dose, and continue her other medications (A.R. 577-78).

In June of 2022, Plaintiff followed up with her primary care doctor after her hospital stay (A.R. 703).  She was still having loose stools, rectal pain, hemorrhoids, gut pain, nausea, weakness, and fatigue (A.R. 703).  She was not referred to a nearby specialist after her hospital stay because her insurance coverage did not apply - she then was out of town temporarily taking care of her parents (A.R. 703).  Her examination was normal (A.R. 708).  Her doctor ordered a gastrointestinal consultation (A.R. 709).  Plaintiff was hospitalized from August 31 to September 6,

2022, for nausea, vomiting, and diarrhea from severe colitis, which resolved with antibiotics (A.R. 727-820).

Meanwhile, in July of 2022, Plaintiff went to a new endocrinologist (A.R. 712-14). Her glycemic control reportedly was poor, she was not exercising, and she was suffering from colitis (A.R. 712). Her examination noted no abnormalities (A.R. 712). Her medications were adjusted (A.R. 713).

In November of 2022, Plaintiff had an internal medicine evaluation by Dr. Surasak Phuphanich (A.R. 830-34). Plaintiff reportedly had said that she had been in the ICU for sepsis for 30 days in September of 1990 (although the record suggests that such stay occurred in January of 2020), and had a long history of diabetes since 1983, periodic migraines for 40 years, and colitis for 20 years (A.R. 830). She had fallen in June and twisted her ankle and thought she might have a fracture (A.R. 830). She said she could do all of her own self-care and household chores (A.R. 830). Her father had died two weeks earlier, and Plaintiff was living with her brother and mother (A.R. 831). On examination, she was dragging her left leg, had difficulty walking, and was unable to walk on toes and heels or perform tandem walking, and had mild lumbar tenderness, left foot tenderness, positive straight leg raising, decreased sensation in the extremities and no ankle jerk reflexes (A.R. 831-34). Dr. Phuphanich diagnosed diabetes, hypertension, diabetic neuropathy, colitis, migraines, and a left ankle sprain (A.R. 834). Dr. Phuphanich opined that Plaintiff could lift 30 pounds occasionally and 10 pounds frequently, sit six hours a day, stand and walk four hours a day, occasionally climb steps and stairs, never climb ladders, scaffolds, ropes, or balance, occasionally do manipulative activities, and never work at unprotected heights (A.R. 834; compare A.R. 93-126 (state agency physicians opining that Plaintiff would be capable of a range of light work)).
///

In January of 2023, Plaintiff went to the emergency room for hypertension, a sore throat, and nausea (A.R. 1072-76). Plaintiff also had a hospital stay from February 18 to 24, 2023, for a hypertensive emergency (A.R. 909-41). She said she was stressed because she recently had moved to stay with her mother, who had dementia, and her father had passed away two months earlier (A.R. 910). Plaintiff had a headache, intermittent chest pain, mild left-hand tingling, left arm numbness, exertional shortness of breath, and blurry vision for the previous three weeks, poorly controlled blood pressure, and she was in emotional distress (A.R. 909-10, 932-33, 936). Plaintiff's blood pressure reportedly was difficult to control during her hospital stay, and her hyperglycemia was uncontrolled (A.R. 910). She improved with treatment and was discharged in stable condition with an endocrinology referral for a possible insulin pump (A.R. 910).

In March of 2023, Plaintiff presented to a new primary care doctor for an annual exam (A.R. 870). She was referred for laboratory testing and to specialists, and counseled regarding diet and exercise (A.R. 875-76; see also A.R. 893 (referring Plaintiff to nephrology and noting Plaintiff had been diagnosed with uncontrolled hypertension with chronic kidney disease and diabetes mellitus ("DX – UNCONTROLLED HTN WITH CKD AND DM")). Plaintiff followed up in May of 2023, and was referred for more lab work (A.R. 864-69).

Plaintiff had a sleep study in May of 2023, which showed moderate apnea (A.R. 844-55). She reported daytime fatigue and sleepiness, numbness in her feet, some unsteadiness in the dark, and constant right-hand numbness (A.R. 845-46). The sleep study doctor posited that Plaintiff's right hand numbness was likely due to carpal tunnel syndrome and the doctor prescribed a soft brace (A.R. 846). The doctor also assessed diabetic polyneuropathy (A.R. 846). Plaintiff returned in February of 2024, reporting continuing issues, and was referred for another study,

1    because she had failed with the type of CPAP machine she had been prescribed

2    (A.R. 838-42).

3

4         In September of 2023, Plaintiff returned to her new primary care doctor, who

5    indicated that Plaintiff's hypertension was "chronic, well controlled in today's office

6    visit" with a blood pressure noted of 101/56 (A.R. 861).  A September, 2023 test

7    showed normal gastric emptying (A.R. 908).  Plaintiff had an iron infusion for

8    anemia in October of 2023 (A.R. 1178-83).  November, 2023 notes report that

9    Plaintiff was not receiving her diabetic medications because she had not seen her

10   doctor (A.R. 878-79).  Plaintiff explained that she had not followed up because she

11   was taking care of her mother with dementia, and her mother recently had a stroke

12   (A.R. 878-79).

13

14        Plaintiff began seeing a new psychiatrist monthly in October of 2023, who

15   continued Plaintiff's prior medications for depression and anxiety (A.R. 944-50,

16   954-57).  In February of 2024, Plaintiff reported she was not doing well, was very

17   depressed, and did not want to get out of bed, but her medication was partially

18   effective in addressing her symptoms (A.R. 951-53).  Plaintiff's mother had passed

19   away in November (A.R. 946).  Plaintiff was given a new medication (A.R. 952).[2]

20   ///

21   ///

22   _____

23   [2]    Plaintiff attended counseling a few times in February of 2024 (A.R. 1184-
      90).  She reported being depressed and anxious and having panic attacks, making it
24   difficult for her to leave the house over the previous several months (A.R. 1185).
      She had been a caretaker for her parents for the last couple of years, had difficulty
25   with caretaking and her parents' deaths, was isolated due to COVID and caretaking,
      and felt overwhelmed by life circumstances (A.R. 1185, 1188).  She was living in
26   her parents' home with her brother and claimed to be housebound (A.R. 1185).
      However, late in February, she reported that she had been getting out of the house,
27   pet sitting, and getting her hair done (A.R. 1189).

28

A nurse practitioner with Indio (or "Indus") Medical Group completed a Physical Residual Functional Capacity Questionnaire in March of 2024 (A.R. 1237-41).  Plaintiff reportedly had been seen every 2-3 months since November of 2023, for diabetes, hypertension, chronic headaches, and depression (A.R. 1237).  Yet, there are no treatment notes accompanying the questionnaire.  Plaintiff reportedly suffered from fatigue and intermittent, severe pain and headaches several times a month related to uncontrolled blood pressure and stress (A.R. 1237).  Her medications cause drowsiness, dizziness, and lightheadedness (A.R. 1237).  The nurse practitioner opined that Plaintiff's symptoms would constantly interfere with her attention and concentration for performing even simple work tasks, she would be incapable of even low stress jobs due to chronic depression and anxiety, she could walk two blocks without rest or severe pain, sit for one hour at a time, stand for five minutes at a time, and sit for less than two hours total and stand/walk for less than two hours total in a workday (A.R. 1238-39).  Plaintiff would need to walk every 15 minutes for five minutes, would need unscheduled breaks every 15 minutes for 15 minutes at a time, would need to elevate her legs to hip level while sitting, could rarely lift up to 50 pounds, and could occasionally perform postural activities (A.R. 1239-40).  Because of her neuropathy, she would be able to use her hands five percent of a workday, fingers zero percent of a workday, and arms 10 percent of a workday (A.R. 1240).  Plaintiff would likely miss more than four workdays a month (A.R. 1240).

## C.    **Applicable Law**

Where, as here, an ALJ finds that a claimant's medically determinable impairments reasonably could be expected to cause some degree of the pain and other symptoms of which the claimant subjectively complains (A.R. 51), any discounting of the claimant's complaints must be supported by "specific, cogent"

findings.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996) (indicating that ALJ must offer "specific, clear and convincing" reasons to reject a claimant's testimony where there is no evidence of "malingering").[3]

Generalized, conclusory findings do not suffice.  An ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony."  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal citations and quotations omitted); see Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ must "specifically identify the testimony [the ALJ] finds not to be credible and must explain what evidence undermines the testimony"); Smolen v. Chater, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); see also SSR 96-7p (explaining how to assess a claimant's credibility), superseded, SSR 16-3p (eff. Mar. 28, 2016).[4]

---

[3]    In the absence of an ALJ's reliance on evidence of "malingering," most recent Ninth Circuit cases have applied the "clear and convincing" standard.  See, e.g., Nerio Mejia v. O'Malley, 120 F.4th 1360, 1363 (9th Cir. 2024); Ferguson v. O'Malley, 95 F.4th 1194, 1197-98 (9th Cir. 2024); Glanden v. Kijakazi, 86 F.4th 838, 846 (9th Cir. 2023); Smartt v. Kijakazi, 53 F.4th 489, 497 (9th Cir. 2022); Leon v. Berryhill, 880 F.3d 1041, 1046 (9th Cir. 2017); see also Ballard v. Apfel, 2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases).  In Ahearn v. Saul, 988 F.3d 1111, 1116 (9th Cir. 2021), the Ninth Circuit appeared to apply both the "specific, cogent" standard and the "clear and convincing" standard.  In the present case, the ALJ's findings are insufficient under either standard, so the distinction between the two standards (if any) is academic.

[4]    Social Security Rulings are binding on the Administration.  See Terry v. Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).  The appropriate analysis under

1

**D.    Analysis**

2

3        In determining Plaintiff's residual functional capacity, the ALJ summarized

4    Plaintiff's testimony and statements (A.R. 49).  The ALJ also discussed the medical

5    record, asserting, <u>inter alia</u>,  that the record showed Plaintiff's diabetes and

6    hypertension and mood symptoms were "well managed" with medication, her

7    hyponatremia was improving, she was never diagnosed with gastroparesis and a

8    study was normal, she only required two hospitalizations for colitis, her kidney

9    disorder improved, and despite being diagnosed with neuropathy, her physical

10   examinations were normal  (A.R. 49-51 (citing A.R. 350-63, 577-83, 908, 948-53,

11   1222-31)).   The ALJ summarized the medical opinion evidence (A.R. 51-52), and

12   then concluded:

13

14           As for the claimant's statements about the intensity, persistence, and

15           limiting effects of her symptoms, they are inconsistent because the

16           record shows management of her diabetes and hypertension with

17           medication not requiring treatment with specialist[s] while also having

18           only two significant flare-ups of colitis without any evidence in the

19           record showing that she had bowel urgency or incontinence.

20

21   (A.R. 52).  The ALJ's stated reasoning is not sufficient for the Court to conclude

22   that the ALJ rejected Plaintiff's subjective testimony and statements on permissible

23

24   _____

     the superseding SSR is substantially the same as the analysis under the superseded
25   SSR.  <u>See</u> <u>R.P. v. Colvin</u>, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5, 2016)
     (stating that SSR 16-3p "implemented a change in diction rather than substance")
26   (citations omitted); <u>see also</u> <u>Trevizo v. Berryhill</u>, 871 F.3d 664, 678 n.5 (9th Cir.
     2017) (suggesting that SSR 16-3p "makes clear what our precedent already
27   required").

28

1    grounds.

2

3        An ALJ permissibly may rely in part on a lack of supporting medical

4    evidence in discounting a claimant's allegations of disabling symptomatology.  See

5    Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although a lack of medical

6    evidence cannot form the sole basis for discounting pain testimony, it is a factor the

7    ALJ can consider in his [or her] credibility analysis."); Rollins v. Massanari, 261

8    F.3d 853, 857 (9th Cir. 2001) (same).  Further, "[w]hen objective medical evidence

9    in the record is inconsistent with the claimant's subjective testimony, the ALJ may

10   indeed weigh it as undercutting such testimony."  Smartt v. Kijakazi, 53 F.4th 489,

11   498 (9th Cir. 2022); see Carmickle v. Comm'r, 533 F.3d 1155, 1161 (9th Cir. 2008)

12   ("Contradiction with the medical record is a sufficient basis for rejecting the

13   claimant's subjective testimony"); see also SSR 16-3p ("[O]bjective medical

14   evidence is a useful indicator to help make reasonable conclusions about the

15   intensity and persistence of symptoms, including the effects those symptoms may

16   have on the ability to perform work-related activities. . . .").

17

18       In the present case, however, it is not clear from the ALJ's limited stated

19   reasoning how the objective medical evidence assertedly was so inconsistent with

20   Plaintiff's subjective complaints as to justify discounting Plaintiff's testimony and

21   statements as a whole.  Compare Smartt, 53 F.4th at 497-98 (ALJ properly

22   identified a specific inconsistency with the medical record in discounting subjective

23   statements where the claimant had alleged she was unable to walk without a walker,

24   but the medical records reported she sometimes was not using a mobility aid and

25   had no difficulty with ambulation).  The ALJ's conclusory assertion that Plaintiff's

26   complaints were inconsistent with the medical evidence cannot properly support

27   discounting Plaintiff's testimony and statements.  See Moisa v. Barnhart, 367 F.3d

28   at 885; see also Ferguson v. O'Malley, 95 F.4th 1194, 1200 (9th Cir. 2024) ("the

ALJ must provide specific, clear, and convincing reasons which explain why the medical evidence is <u>inconsistent</u> with the claimant's subjective symptom testimony") (emphasis original).  This is particularly so because the medical record suggests, contrary to the ALJ's assertions, that Plaintiff's diabetes and hypertension were <u>not</u> "well managed" with medications.  Plaintiff had repeated emergency room visits involving these conditions, and during one hospital stay there were noted difficulties with controlling these conditions even in a hospital environment (A.R. 910).  Only one brief treatment note characterized Plaintiff's hypertension as being controlled "in office" (A.R. 861; <u>compare</u> A.R. 892-93 (same doctor diagnosing uncontrolled hypertension and "brittle" type 1 diabetes while referring Plaintiff to specialists)).[5]  Additionally, as summarized above, and seemingly contrary to the ALJ's assertion, the record shows that Plaintiff <u>was</u> treated by specialists (endocrinologists and nephrologists) for these conditions, and that, when Plaintiff moved to a new residence location, she again sought and was given referrals to an endocrinologist and a nephrologist (A.R. 892-93).

Defendant suggests that Plaintiff's daily activities conflicted with Plaintiff's allegations of disabling impairments.  <u>See</u> Defendant's Brief at 9-10 (citing A.R. 45-46).  The ALJ mentioned some of Plaintiff's daily activities in finding that Plaintiff had no severe mental impairments.  <u>See</u> A.R 45-46 (finding from Plaintiff's daily activities that she had no limitations in adapting and managing herself).  However, the ALJ did not cite daily activities as a reason for discounting

---

[5]    "Brittle diabetes is a name doctors give diabetes that is especially hard to control.  It's also called 'labile' diabetes.  The words brittle and labile can both mean 'unstable' or 'easily changed.' ¶ When you have brittle diabetes, your blood glucose levels often swing from very low (hypoglycemic) to very high (hyperglycemic)."  <u>See</u> Ellis, R.R., "<u>What is Brittle Diabetes?</u>" available at <u>https://www.webmd.com/diabetes/cm/brittle-diabetes-all-about</u> (last visited Oct. 9, 2025).

1    Plaintiff's subjective statements regarding her work-related limitations.  The ALJ's

2    decision does not expressly state any specific reasoning for discounting Plaintiff's

3    testimony and statements beyond the largely conclusory assertion of inconsistency

4    with the medical record.  See A.R. 48-43.  The Court may not properly rely on

5    reasons other than those specified by the ALJ.  See Brown-Hunter v. Colvin, 806

6    F.3d 487, 494 (9th Cir. 2015) (court is constrained to review only the reasons the

7    ALJ specifically identified); cf. Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir.

8    2001) (the court "cannot affirm the decision of an agency on a ground that the

9    agency did not invoke in making its decision"); see also Connett v. Barnhart, 340

10   F.3d 871, 874 (9th Cir. 2003) (reversing district court's decision where the district

11   court had affirmed on the basis of reasons supported by the record but unstated by

12   the ALJ).  Accordingly, the Court cannot properly credit Defendant's suggestion

13   that Plaintiff's statements were inconsistent with her daily activities.

14

15       The Ninth Circuit does "not require ALJs to perform a line-by-line exegesis

16   of the claimant's testimony, nor do they require ALJs to draft dissertations when

17   denying benefits."  Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020).

18   However, the Ninth Circuit does require that ALJs "specifically identify the

19   testimony [from a claimant] she or he finds not to be credible and [ ] explain what

20   undermines that testimony."  Id. (quoting Treichler v. Comm'r, 775 F.3d 1090,

21   1102 (9th Cir. 2014)).  Especially in light of the record reflecting ongoing treatment

22   for uncontrolled hypertension, diabetes, and other conditions, it is uncertain

23   whether the ALJ adequately considered Plaintiff's testimony concerning her

24   limitations.  The ALJ's stated reasoning is inadequate to permit the Court to

25   conclude that the ALJ considered and rejected Plaintiff's testimony and statements

26   on permissible grounds.  Nor can the Court conclude that the ALJ's failure to state

27   legally sufficient reasons for discounting Plaintiff's subjective complaints was

28   harmless. "[A]n ALJ's error is harmless where it is inconsequential to the ultimate

1    non-disability determination." Molina v. Astrue, 674 F.3d at 1115.  There is no

2    substantial evidence in the record that a person as limited as Plaintiff claims would

3    be able to do her past relevant work (if she had any past relevant work).[6]

4

5    **II.    On the Present Record, the Court Cannot Properly Determine Whether**

6    **Substantial Evidence Supports the Administration's Finding that**

7    **Plaintiff Had Past Relevant Work Within the Now-Applicable 5-Year**

8    **Lookback Period.**

9

10    In finding Plaintiff not disabled, the ALJ stated Plaintiff would be capable of

11    performing her past relevant work based on looking back to the work that she did

12    within the previous 15 years (A.R. 43, 54).  Plaintiff argues that substantial

13    evidence does not support a finding that she had any past relevant work within the

14    now-applicable 5-year lookback period because the one job she worked during that

15    period assertedly was below the level for substantial gainful activity ("SGA").

16    Unless Plaintiff's prior work constituted SGA, the work could not qualify as "past

17    relevant work." See 20 C.F.R. § 416.960(b).  The issue is unclear on the present

18    record.

19

20    At the time of the ALJ's May, 2024 decision, the lookback period for

21    determining past relevant work was 15 years.  See 20 C.F.R. § 416.965(a) (eff.

22    Aug. 24, 2012 to June 21, 2024); see also A.R. 43 (ALJ noting same).  In the month

23    immediately after the ALJ's decision, the lookback period was shortened to 5 years.

24    See 20 C.F.R. § 416.965(a) (eff. June 22, 2024).  Social Security Ruling 24-2p

25    provides that the new lookback period  applies to claims filed or pending on or after

26    the June 22, 2024 effective date.  See SSR 24-2p, 2024 WL 2846571, at n.1.

27    _____

28    [6]    See section II, infra.

20

Plaintiff's claim was still pending as of June 22, 2024. As of that date, the ALJ had denied Plaintiff's claim, but the denial was not yet a final decision of the Administration because the Appeals Council had not yet ruled on Plaintiff's application for review. Accordingly, this Court must analyze the administrative decision under the 5-year rule. See id. ("We expect that Federal Courts will review our final decisions using the rules in effect at the time we issued the decisions.") (emphasis added).[7]

Plaintiff reported that she worked three jobs in the 15 years before she became unable to work. She reported that she worked as an administrative assistant for a design store from January to August of 2019, working 24 hours a week for $16 per hour (A.R. 243, 249-50, 257-58). Plaintiff later testified that she worked at the design store from February to August of 2019, and had worked approximately 32 hours a week for $16 per hour (A.R. 70). Plaintiff also testified that she missed work in the first few months of that job due to illness (A.R. 73). Plaintiff's earnings record showed that she earned $8,528 in 2019 (A.R. 227, 229, 233, 237), which was less than what would be expected if she had worked consistently in that job. The threshold for SGA in 2019 was $1,220 per month. See https://www.ssa.gov/oact/cola/sga.html (providing table of monthly SGA amounts since 1975).

Plaintiff also reported working as an administrative assistant for a law office in 2014 and 2015, for 7.5 hours a day, five days a week, at $15 per hour (A.R. 257, 261). Plaintiff testified that she worked for a year and a half in the law office job for $16 an hour and 36 hours per week (A.R. 69). Plaintiff's detailed earnings record showed she earned almost $20,000 in 2014, and almost $17,000 in 2015

---

[7]     Moreover, even if the new lookback period did not previously apply to Plaintiff's claim, it will apply on remand. See id.

(A.R. 226-27, 229, 237), which was above the threshold for SGA in those years of $1,070 and $1,090 per month.

Plaintiff also testified to working a third job as a human resources assistant for Goodwill for four months in 2012, where she worked 30 to 40 hours a week for $8.75 or $9.75 per hour (A.R. 67-68; see also A.R. 257, 263-64 (Work History Report indicating she had two internships in 2012 where she worked 40 hours a week and earned $8.75 per hour from January to April, and from October to December)). Her earnings record, however, showed she earned only $2,674 in 2012 (A.R. 226, 229, 237), which was less than what would have been expected if she worked as much as she testified. The threshold for SGA in 2012 was $1,010 per month. Plaintiff's reported earnings would not rise to this level if she performed this job for four months - her average monthly income would have been only $668.50 (i.e., $2,674/4).

The vocational expert classified Plaintiff's job with Goodwill as a personnel clerk, DOT 209.362-027, and her jobs with the design store and law office as an administrative clerk, DOT 219.362-010 (A.R. 78). The vocational expert testified that a person with the residual functional capacity the ALJ found to exist could perform these jobs as generally performed (A.R. 79). The ALJ relied on the vocational expert testimony to find Plaintiff capable of performing past relevant work as a personnel clerk and administrative clerk as generally performed (A.R. 54). The ALJ stated, "As required by SSR 82-62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period" (A.R. 54). The ALJ did not explain how she determined that any of Plaintiff's work was SGA. It appears that the ALJ may have relied on Plaintiff's reported hours and hourly rate rather than on Plaintiff's actual earnings records, since the Goodwill job clearly was

below SGA according to Plaintiff's earnings statements.

If the Court examines only Plaintiff's work in 2019 (as this Court must because it is the only work within the 5-year lookback period) the record is unclear whether this work was SGA. Plaintiff stopped working on August 4, 2019 (A.R. 242). If Plaintiff worked at the design store job for seven months (i.e., from January until the beginning of August) as reported, then her average monthly income would have been $1,218.29 (i.e., $8,528 / 7), just below the SGA threshold of $1,220 per month. If, however, she worked at that job for only six months (i.e., from February until the beginning of August), her average monthly income would have been $1,421.33 (i.e., $8,528 / 6), above the $1,220 SGA threshold. Thus, the question of precisely how long Plaintiff worked for the design store may be determinative of whether that work constituted SGA. If she worked at least seven months, it would not meet the threshold; if she worked less than seven months, it would meet the threshold. The ALJ's decision does not answer this question. Furthermore, in finding that Plaintiff's past work was SGA, the ALJ may have been relying on Plaintiff's law office work in 2014 and 2015, and not her design store work in 2019.

While a claimant has the burden at step four to show that the claimant is unable to return to the claimant's past relevant work, the Administration must make specific factual findings to support the conclusion that the claimant can perform past relevant work. Pinto v. Massanari, 249 F.3d at 845; see also SSR 82-62, 1982 WL 31386, at *4 (presumptions, speculations, and suppositions may not be used to explain why a claimant can meet the demands of past relevant work). The ALJ's findings in this case are not specific enough on the available record for the Court to conclude that substantial evidence supports the ALJ's SGA determination when the analysis is restricted to the 5-year lookback period.

The Administration should expand and clarify the record and revisit this issue on remand (if resolution of the issue proves necessary to the resolution of Plaintiff's claim). Compare Faulkner v. Dudek, 2025 WL 602216, at *2 (9th Cir. Feb. 25, 2025) (declining to remand for an award of benefits where court could not determine from the record if the clamant had past relevant work in the now applicable five-year lookback period which applied after the ALJ's adverse decision in that case; on remand, the Administration could develop the record and make specific findings concerning past relevant work).

## III.    Remand for Further Administrative Proceedings is Appropriate.

Remand is appropriate. The circumstances of this case suggest that further development of the record and further administrative review could remedy the ALJ's errors. See McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011); see also INS v. Ventura, 537 U.S. 12, 16 (2002) (upon reversal of an administrative determination, the proper course is remand for additional agency investigation or explanation, except in rare circumstances); Leon v. Berryhill, 880 F.3d 1041, 1044 (9th Cir. 2017) (reversal with a directive for the immediate calculation of benefits is a "rare and prophylactic exception to the well-established ordinary remand rule"); Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits"); Treichler v. Comm'r, 775 F.3d 1090, 1101 n.5 (9th Cir. 2014) (remand for further administrative proceedings is the proper remedy "in all but the rarest cases"); Harman v. Apfel, 211 F.3d 1172, 1180-81 (9th Cir.), cert. denied, 531 U.S. 1038 (2000) (remand for further proceedings rather than for the immediate payment of benefits is appropriate where there are "sufficient unanswered questions in the record"); Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) ("Connett") (remand is an option where the ALJ fails

to state sufficient reasons for rejecting a claimant's excess symptom testimony); <u>but see</u> <u>Orn v. Astrue</u>, 495 F.3d 625, 640 (9th Cir. 2007) (citing <u>Connett</u> for the proposition that "[w]hen an ALJ's reasons for rejecting the claimant's testimony are legally insufficient and it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony, we remand for a calculation of benefits") (quotations omitted); <u>see also</u> <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 495-96 (9th Cir. 2015) (discussing the narrow circumstances in which a court will order a benefits calculation rather than further proceedings); <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1166 (9th Cir. 2014) (remanding for further proceedings where the ALJ failed to state sufficient reasons for deeming a claimant's testimony not credible); <u>Vasquez v. Astrue</u>, 572 F.3d 586, 600-01 (9th Cir. 2009) (a court need not "credit as true" improperly rejected claimant testimony where there are outstanding issues that must be resolved before a proper disability determination can be made). There remain significant unanswered questions in the present record.

## ORDER

For all of the foregoing reasons, the decision of the Commissioner of Social Security is reversed, and the matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: October 20, 2025

_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE